Gary Ishimoto? Ishimoto. Ishimoto. Okay. Thank you, Your Honors, and may it please the Court. My name is Gary Ishimoto, and I represent the plaintiffs who are the appellants in this case. As a quick summary of relevant facts, appellants visited Appellee Eyemart's website for a variety of reasons, either to search for prescription products, purchase prescription products, or schedule eye exams. At issue in this case is the fact that Eyemart decided to install secret tracking software onto its website. Now this tracking software would allow Eyemart to share specific details about a user's activity on the website with Meta. And when I say share, I don't mean that Eyemart received the information and then subsequently transferred it to Meta. I mean that this information was taken directly from users' browsers, and taken directly from users' browsers by Meta and sent to Meta's own receiving servers. In essence, Eyemart never received the information before it was captured by Meta, and we think that this is an important detailed highlight. Now when users were using the website, in particular, they could, when they were purchasing prescription glasses, they had a choice. When they made a selection for frames, one event would trigger, which would track what frames were chosen. When they actually added prescription lenses to the cart, after adding their prescription information to the website, a second add to cart event was triggered, causing additional information to be disclosed to Meta. In particular, what the material of the lenses were made out of, the company that fulfilled the prescription lenses for actual fulfillment, and then in addition to that, the identity of the user through the unique Facebook ID. Now the issue here is that the district court resolved all of the plaintiff's claims essentially on one issue, which is whether or not IIHI, as discussed under HIPAA, was actually shared with Meta. Appellants assert that there's two reasons why the district court erred. The first is that the information at issue actually did disclose IIHI to Meta, and the second was that this issue didn't even need to be reached because it didn't, the district court didn't properly analyze why IMART was a beneficiary of the party defense as enumerated under 25112D, and whether it actually provided consent to the transmissions conducted by Meta. If we're looking at the two categories, you accept the two categories the district court put out there? Yes. Okay. So just focusing on Ms. Rand and those plaintiffs, the browsing plaintiffs. Yeah. As a broad statement, would you agree that browsing is not disclosing, or would you push back on that? And if your contention is that browsing does disclose private information, would every single case similar to this one have to go to discovery? So I think Rand is a special case because she didn't just browse. We would actually lump her with the prescription plaintiffs, and the reason for that is she actually scheduled an eye exam through the website in addition to browsing, and so we think that comes closer to the purchase prescription items rather than being on the mere browsing side of things. If we're talking about mere browsing, there's one thing that, actually there's two things that we would be kind of concerned about admitting that on this issue. The first is whether or not this sort of cumulative tracking would have grabbed other information through the user's journey on the website. It's possible that they browsed one day and they made a purchase another, and that combination of information might be useful in inferring what the medical condition of the user is. But if I type into Google or anywhere on the internet, then, oh, I want to look for my high school friend that's now a doctor. That doesn't implicate any privacy, really, does it? We agree. We agree. So what's the line? So the line here for us is that, one, IMART is a retailer whose specific existence is to provide prescription goods to users, and so we think that the fact that a person is visiting a retailer for prescription goods is a little different from a generic Google search. The second reason why we would disagree is, again, with that combination of information, we don't know what all has been tracked. We only know what's been tracked from the user's browser. And what I mean by that is there's a number of other tools at play here. I think plaintiffs like to So this is just to cut, this is an argument to get past 12B6. In other words, we don't know the terms that were put in. It could have said, I have glaucoma, which would have been much more direct, and it would have been captured. Likewise, we don't know what data these pixels collect, and therefore you just need to know both, but you could ultimately still lose. Correct. So we know the types of data that they collect, and I think plaintiffs pointed this out in their palance brief, too. We don't have the exact transmissions made from plaintiffs' devices at the time of the transmission. All we know is how the website behaves, and whether or not their behavior on that website would have resulted in certain kinds of information being sent. So we know that searches were captured, but we don't know the exact search content until we either get that information from IMARC or through MEDDIC. The principal case side by the district court, it's a short opinion, but it's reinforced as the American Hospital case out of the Northern District of Texas. There's extended discussion about what is personal health information and what isn't. Do you want to address that case? Absolutely. We think American Health Association of Ybicira is distinguishable on a number of factors. The first is the case was really dealing with the rulemaking sort of obligations that HHS has when it put out guidance. I think it was referring specifically to a hypothetical where a company had disclosed the URL of a user in addition to the IP address as identifying information. Now that particular combination of information is an added issue here. And they also had a different role in assessing the guidance that HHS put out. I think the case of Hartley versus University of Chicago Medical Center talked about this specifically. And they noted that Ybicira wasn't looking at specific allegations put forth by plaintiffs. It was dealing with this sort of generalized hypothetical and whether or not the rule would apply to all cases as applied to that hypothetical. And we think that there's a big distinction in those two differences. These pixel tracking cases are popping up all over in district courts. Is there any instructive circuit court opinion? It's hard to say because one issue that appellants have also dealt with is there's an inconsistency in the way that this tracking technology is alleged to behave. In some cases you have plaintiffs alleging that the website receives it first and then subsequently hands it over to a tracking entity like Meta, like Google. Just to be clear, I think the question was simply are there any circuit court opinions? So the reason I was setting that up first is because there have been a number of circuit court opinions that looked at this. NRA Nickelodeon and NRA Google in the third circuit looked at this issue where the plaintiffs essentially alleged that there was tracking on a website where the website had content that was delivered both by the host website and by one of the tracking entities itself. And so you think factually there's a distinction in sort of the tracking technology at issue there. In addition, I believe there was the allegations of tracking technology in the first circuit in NRA PharmaTrack. And again, there's this issue of who receives the information first and whether you hand it off. And we think that this distinction is important because I think all parties agree that where the recipient of a communication receives it and then subsequently hands it off, there's no interception. The facts here actually matter as to at what point it's intercepted, where it's intercepted, and who is... But the district court here didn't really get into the wiretap act and arguments at all. It sort of stopped at no personal health information. Agreed. That was part of why we felt that appeal was so necessary here. There's a number of elements within this that we felt the district court sort of glossed over. And one element of that was the exceptions that exist in 2511 2D. There's both the party defense, the consent defense, and then at the very end of that, which is only supposed to apply if they're otherwise not liable for any of the conduct, is the crime tort exception. HIPAA only applies to that crime tort exception. And so we felt that it skipped over the actual party and consent analysis before getting to the HIPAA analysis. And appellants would argue that the party exception is really only limited to direct interceptors. The language of the statute is pretty clear where a person who intercepts a communication not under the color of law is not liable where such party was a... Or where such person was a party to the conversation. We think that such limits that application to only direct interceptors. And as to the consent issue, the district court did not even explain what qualifies as consent. And because consent isn't defined within the statute, appellants contend that the best way to interpret it is through the plain meaning of the language, either at the time that 2511 2D was enacted or when it was amended under the ECPA. In each case, consent is specifically defined as acquiescence to the will of another under Black's law. It involves some offer by a third party to engage in conduct to which the person providing consent agrees. Here there's been no offer of a plan by a third party that IMART supposedly consented to. The only thing that appellants could find, and they point to this in their amended complaint, is this meta tools business terms, which actually explicitly prevents or prohibits the sharing of health-related or sensitive information, period. Not legally protected, not HIPAA compliant, just health or sensitive information. And we believe that this broader category would prevent consent from being found here. Back on just the prescription plaintiffs, what did the district court rule and where was, where do you perceive error in that? So the district court ruled a number of things. They essentially required plaintiffs to show either prescription data was actually transmitted to meta or that something identifying the transaction as prescription related was sent to meta. Here appellants argue really that the only way to get to one of those add to cart events, the second one with the lenses, is only possible after you've already put in your prescription information. That second event essentially identifies someone as having prescription goods even though it doesn't say as much. And we think that is close enough to relates to as defined by IIHI. And requiring the actual identification we think unnecessarily tightens the standards for what qualifies as IIHI. Now one final thing we'd like to add for this is two of the plaintiffs in this complaint were added in the amended complaint. That's particularly the purchasing plaintiffs. Plaintiff Lash and Plaintiff Mies. The district court, we think, did not provide them an opportunity to amend in any way to provide the additional information it would have sought when it provided the most recent motion to dismiss or order on commission to dismiss. We think there are amendments that could have been made and we think that denying them the ability to amend was was an error. If there's no other questions from this court, I'd be happy to reserve the rest of my time for rebuttal. All right, thank you. You have time for rebuttal. We'll now hear from the appellee, Star Drum for Imart Express. Good morning. Your honors, may it please the court. My name is Star Drum and I represent Imart Express. This court should affirm the district court's holding for the reasons that Appellant just walked through. First, plaintiffs did not plausibly plead that their PHI was transmitted or IIHI was transmitted in connection with their visits to Imart's website. As Appellant discussed, and we agree, these plaintiffs went to the website for various purposes and those purposes included browsing materials. It could have included the exploration of whether there were eye doctors within a specific location, but crucially there could not be any appointment booking or actual exam scheduling through the Imart website. It is just a simple directory of providers and there's no indication that the purpose for locating providers or locating locations of Imart websites is the purpose of providing PHI. For the plaintiffs that claimed that they provided prescription information through the website, those plaintiffs were told by the district court in the first instance when the complaint was dismissed that the basis for that dismissal was that the three plaintiffs who initially appeared had not provided PHI information through the website. So plaintiffs were given leave to amend their complaint. They did. They added screenshots that showed events that can happen on the website. There are pages where prescription values can be entered for certain types of glasses. Those pages where that information can be entered, plaintiffs cannot then tie that to the transmission to Meta. The district court confirmed that that did show a transmission to Imart of that prescription information when those values were entered, but plaintiffs did not show that any of that prescription information was then transmitted to Meta and could not credibly plead that that was the case. Just taking a second, go ahead. Would you agree that there really are three categories, not two? Ms. Rand is sort of in between. There are browsers, then there's Ms. Rand scheduling an examination, and then you've got the various people that put in prescription information. Judge Higginson, I would still put her in the search category because, as I said, there was no capability for her to actually schedule an exam through the website. As plaintiffs acknowledged in both their initial complaint and amended complaint, the scheduling function provides you with a phone number link to a particular practice. It does not allow you to actually schedule an eye exam, so the fact that there is a directory that's available to a plaintiff who may have had a subjective intent or may not have to schedule an eye appointment doesn't put her in a prescription  category. It really comes down, do you accept that it comes down to the search terms? If I type in, I have leukemia, where's the nearest oncologist? Your Honor, I would disagree that even if someone did type in that, that we can't appreciate the subjective intent of why that person put that into a search bar. I have leukemia. I'm sorry? Types in, I have leukemia. I have a large prostate. Where's the urologist? I need a CT scan. Once you type substantive material like that? Your Honor, I litigate a lot of these matters, and I often see plaintiff's lawyers type in those types of things into the search bars to sort of create the exemplars that we're talking about today. So in those situations, clearly the individual who is typing that type of information doesn't actually have the condition to express those things. Is it PHI if a person, that a person is seeking medical care? Yeah, in the context of a person, I mean, under the strict definition of HIPAA, yes, a person that is seeking medical care and when that information is disclosed. Isn't that what plaintiffs are saying as you hear? They're making clear that they're seeking care. They allege that Rand was seeking care, but again, they couldn't have been seeking care from our client. They couldn't have been, they couldn't have conducted an activity that transmitted PHI, i.e. I need to schedule an appointment via the IMART website because all the website allowed plaintiffs to do was have a directory of individual providers. So there are cases... But isn't finding a provider part of the process of seeking care? It is part of the process, Your Honor, but until you actually get to a point where you're talking about a specific condition, having a specific appointment scheduling... I need a doctor. So just that information. I'm not talking about what's the search term, but just the fact that somebody is in need of care or is seeking care. Yes, in context, that does constitute PHI. That's correct, Your Honor. How do you distinguish the Southern District of California Cousin's decision? Your Honor, the Cousin's decision was unique in a number of respects. There were allegations that a patient portal in that case had tracking technologies embedded in the patient page where someone who is actually a patient of a covered entity has to go beyond a portal and conduct activities within a space that is clearly for patients of a specific provider. That puts you in a different place than mere browsing activity. The Cousin's decision is different from the analysis that the Serocourt provided where, again, the subjective intent of a browsing type of activity on a website doing things like searching for appointments, like we talked about, or searching for providers without a specific basis to understand what the subjective intent for a website visitor is when they're visiting a website puts them in a difficult... puts all covered entities in basically an impossible position of having to understand the subjective intent of all of their website visitors. They cite a few other cases that seem to be browsing, the Walgreen decision, and then what's the Loyola University one? So once you say that all turns on subjective intent, doesn't that get you past 12b6? They've made a plausible allegation. They just don't have how the sort of the data processing problem works, the analytics. They don't know the answer to these questions, where it puts you on the spectrum. I disagree, Your Honor, that the subjective intent does get you past 12b6. I believe the Becerra opinion is... But Becerra's an administrative overreach case, right? It is a different hypothetical, factually, but... But it didn't even have a Facebook ID capacity, so we didn't have identifying information of particular people. Well, it had identifying information in the form of IP addresses, and so there's a distinction made between a device that's particularly identifying versus a Facebook ID that's tied to a unique user, but IDs, IP addresses, and device identifiers can all be linked back to an individual, and the issue here is not in the identifier component. The identifier component, we agree that a Facebook ID can identify a specific user. I mean, that's the whole purpose of what Google and that are doing. Correct. The advertisers wouldn't want the information if you can't identify exactly the person who has glaucoma is, so then you can send them a lot of, hey, I'm the best glaucoma doctor. Correct. We, to be clear, we don't have glaucoma doctors. IMART Express just has glasses, so the only thing... Right, but if prescription information or if an exam is scheduled, then it sounds like there's some health condition. Again, we can't schedule exams, and we do concede that prescription information was shared with IMART, so there is no doubt there is a page value where you can enter prescription information for your lenses, but that information is not shared with Meta. The plaintiffs, all of the and plaintiffs included that information. Okay, I'm looking at the amended complaint, paragraph 75. The descriptions and summaries of prescription are then shared with the tracking entity, and then at 161, the defendant uploads the customer list to Meta that contain tracking user email addresses, purchase information, including what prescription eyewear they purchased, so they do allege that they passed on the prescription information. Yes, and so the wording of paragraph 75 is pretty careful. It says the descriptions and summaries of prescription products. They don't say that the actual prescription values are shared, so those are summaries of prescription products or non-prescription products, and they show that in their exemplar when they show this is the brand, this is the price. They're careful in not pleading that the actual prescription value, i.e. the power access, etc., of the glasses is shared with Meta, because it's not. I mean, that's, when you think about the purposes. Well, you might then win conclusively if that statement's true, but I read it. They're saying that you're these pixels. You control what the data is that's collected. They don't know. Sure, but the district court properly assessed. Well, the district court on that just said, I don't see in the exemplars that allegation, but it didn't go through the actual allegations. It seems to treat the exemplars as conclusive of the allegations. Well, and that's based on well-settled precedent in the circuit, Your Honor, that where exhibits attached to a complaint contradict the bare text allegations of the complaint. Well, what's the contradiction? They gave examples, but it didn't say, and this is inconsistent with what we're seeing in paragraph 161, what we're seeing at 75. Well, it is inconsistent in the context of figures 11 and figures 12 as compared to figure 5 of the amended complaint, where in figure 5, they walk through, here's where we're entering the prescription values. Then in figures 11 and 12, they attempt to name the figures and say that they reflect the sharing of prescription information with MEDA, but there's no values in those exemplars that they included that shows that prescription information is shared with a third party, and the district court properly analyzed that because those exemplars did not show that any information had been transmitted to MEDA when it had given them direct guidance in the first instance that there was no basis for him to determine that PHI had been shared with MEDA, that they had not done the work they needed to do in order to survive 12 v. 6. I mean, given the complexity of this, why was this appropriate on a motion to dismiss? Your Honor, because it's under Twombly and Iqbal, plaintiffs cannot plead the mere possibility of a harm, and that's all they've done here, and I even heard my friend on the other side in his initial presentation reference that there was a possibility that MEDA had received information from our client, but that is not the pleading standard that we operate under. We have to have something that ventures into the plausible from the mere possible, and so they have a very lengthy complaint. This is an issue that they have tried to complicate, but... And they can't, so they can't do discovery? That's correct, Your Honor. They haven't satisfied the requirements that this court, others have adopted, that the Supreme Court has set forth requiring cases, requiring pleadings under Rule 8 to have more than mere possibility. They have to be plausible, and nothing they've pled in terms of any violation reaches into the plausibility arena. I wanted to... So you're saying it's not plausible, just possible? That's correct, Your Honor. We would actually say that it's impossible because there is no sharing of information with MEDA, and so it wasn't possibly pled, it's not plausibly pled, but yes, they don't reach into the correct standard that they had to in order to satisfy the requirements of pleadings before federal courts. The other side... Oh, and I apologize, Your Honor. You had asked a question, Judge Higginson, that I didn't address directly about the Walgreens case. The distinction for the Walgreens case, I believe, was that the plaintiffs had pled specifically certain types of healthcare products that they had added to their cart, and they showed in the exemplars in that complaint, in the URL of the website, where those products were actually included in the header information of the URL. Here, we have the header information from the URL that's been included in the exhibits that the plaintiffs added. In the exhibits where they add the prescription lenses, the Nike brazen boost from exhibits, yeah, figures three through six, the URL header does not change. It just says, it doesn't say things like, you know, single vision or progressive. None of the values that users actually select when they're going through and actually selecting prescription products are included in the URL information. The URL just says Nike brazen boost, Nike brazen boost, and it doesn't change throughout that process. So that information in the URL isn't getting modified and transmitted to Meta or anyone. It's really staying constant, even as these other values are added. I also think that my colleagues on the side referred to the Meta software as a secret tracking software. As I mentioned, this is code that is publicly available. It's not information that is hidden or surreptitiously deployed. They even include in their own pleadings, not just captures of the code, but the implementation of a tool called the Metapixel Helper and the description of the Metapixel Helper that allows anyone to identify on any browser when the Metapixel is active and firing and what events it's capturing. So this is not done in a clandestine or surreptitious way. All of the plaintiffs acknowledge that they have Facebook accounts, so that they have agreed with Facebook to have information shared, including their profile pictures. And again, just taking our clients specifically sort of without the broader context, I mean, what we're talking about here is glasses. We're not talking about contact lenses or any other type of prescription information or healthcare information that is purchasable at all from our client's website. And glasses are something that if you have glasses, whether they're prescription or non-prescription glasses, they're apparent, they're on your face. So to claim some sort of privacy interest would be associated with the purchase of glasses, strange credulity. And that's part of the basis too that we think an alternative basis to dismiss or to vacate the district court's ruling and direct it to dismiss based on lack of standing is because in the first instance... Where do you get that in the text? The text of what, Your Honor? The definition of PHI and IIHI and all these, this notion that if it's obvious to third parties, that it's somehow not privacy. Your Honor, it's not strictly in the text that it's something that's public, but just there's a claim in plaintiff's complaint for... Would you agree that it doesn't matter how easy it is to detect? If it's medical information, it's medical information. That's correct, Your Honor. In the context of standing, however, plaintiffs have alleged essentially evasion of privacy is an analogous underlying tort as the basis for their standing. And the district court in its first opinion dismissed and sort of did a summary analysis and said plaintiffs had standing because they alleged that PHI was exposed. But plaintiffs have not credibly alleged PHI was exposed. And when you go into the arena of assessing whether there is an analogous underlying tort that could be the basis for their statutory claim, there's no credible invasion of privacy harm alleged because there has to be a level of offensiveness. And there's common law principles in the terms of the private disclosure of public facts. And so even if there's not a strict definition of glasses constituting PHI, the level of offensiveness requirement that there has to be some offensiveness to a reasonable person in order to constitute an invasion of privacy harm. Well, I mean, I understand that like your opponent, we can see the glasses, but we don't know how he got them, why he got them, how bad things were, et cetera, et cetera. So I don't think that just knowing somebody has glasses means you know everything about their medical issues on their eyes. That's correct, Your Honor. And that's why it's really important to note that they didn't sufficiently plead that anything about the actual prescription information was shared with MEDA. And so there's no PHI that's actually been shared. There is information that is shared with MEDA about glasses being added to a cart, either of a certain type, of material, of a certain price, but there is no information providing actual health information in the context of that. So with respect to the other common law claims that they have in terms of intrusion upon seclusion, any basis outside of the alleged sharing of PHI is simply not plausible here. And just since I'm short on time, I did want to address very quickly that plaintiffs or appellants focused on the direct interceptor issue and said that the district court erred because it did not address whether IMART Express was a direct interceptor or the procurer of an interception. We obviously, to the extent that we think under the direct interceptor position that there is an exception for the party consent, because we were a party to the communication, we transmitted communication to MEDA, we consented to that communication. But to the extent they are attempting to couch IMART as a procurer instead of a party to the interception, this court has held in PVVWFAA TV, a 2021 case, that it went through the analysis of the 1986 amendments to the Electronic Communications Privacy Act and noted that while there had been a provision attributing civil liability to procurers of an interception, that that provision was explicitly removed by Congress in the 1989 amendment. So this circuit has already held that there is no private right of action, no civil liability for procurers of an interception versus the interceptors themselves. So if plaintiffs are attempting to amend what basis they think that IMART or what position it has in the context of an interception, we believe that PV is controlling and that there's no, we have not found any authority that contradicts PV in this circuit or that has held it to no longer be the law in the circuit and it's the pure textual interpretation of ECPA and based on the legislative history, it's clear that no procurers have civil liability under ECPA any longer. Just so I'm going to try to understand your argument, is it that even if we were to conclude that there was PHI at issue with these, with all of your class reps, that there's no allegation in the complaint that this information was ever transmitted from IMART to META? That's correct. So we can affirm on that alternative ground if we... That's correct, your honor. Okay, thank you. We'll now hear the rebuttal. Before you get started, can you address the point I just made that what is it in your complaint that makes clear that the PHI you're alleging is at issue here was in fact transmitted from IMART to META? So we're actually arguing two different transmissions here. There's one transmission to META which included the information that we are aware of and we included in figures 12, 10 through 13 I think in our complaint. There's a whole separate list of information we're not sure of because we made clear in the complaint there's really different tools META provides. Some that operate on users' browsers that we can see and some that operate on the servers that we have no idea what's being passed. But you would agree that these are things you need to allege in your complaint? I believe... We can't assume it. That was included. The conversions API is discussed numerous times through the complaint and it's described that the information is from IMART side and we really have no way of knowing from the user's device what's happening there. But as to what we actually allege that communications at issue here, we agree that IMART is not receiving the information and then passing it to META. We're saying this information is taken directly from user's devices and sent to META. And the issue of procure liability... Can you explain that? Because obviously you're suing IMART so IMART has to be responsible in some way. Right. We think that that actually goes to the fact that IMART is the one that added the pixel to the website. META wouldn't have been able to obtain any of these communications had IMART not chosen to add the pixel code to its website. So your theory is by IMART choosing to make use of pixel, that's how they are liable for transmission? Correct. And they have the option to choose what information they track on the website. It's up to them if they want to track certain button clicks, certain URLs, what information is taken and at what point. But once they've made that decision, the code is loaded from Facebook's own servers onto the user's browser after it's called by the code placed by IMART. And then once that monitoring starts, that information is sent directly from user's browsers to META. And it doesn't touch IMART's hands except for the information that's otherwise sent to them directly from the user. Now, as for the procure liability issue, there's one thing that we do want to address here, which is that the WireTap Act doesn't just prohibit the interception itself. It also prohibits the use of information that's incorrectly or improperly intercepted. We're arguing that IMART actually used the information for marketing purposes in violation of the WireTap Act and it's also an enhanced injury under HIPAA itself too. And we would attest that that use of the information is not mere procurement. It's a separate act that they have liability for and for which the private right of action under the ECPA allows claims to be brought. So we would contest this isn't really a PV issue because of the use of information. Now, one thing that was mentioned is that there's no way to schedule eye exams through IMART. Factually, we believe that's incorrect. In figure 11 of our amended complaint, there's actually a picture showing the sending of information that a person clicked a IMART website. And that happens after they've chosen a specific location and the information that's sent to meta, all of these are pictures of information being sent to meta. That information includes the location with which they've chosen to receive that eye exam and it includes a detailed notice that the button that was clicked says schedule eye exam. This isn't an issue we think of inferred or subjective intent. We think the explicit intent is included in the information being sent through the pixel. Whether you're purchasing information or whether you're scheduling an eye exam. You don't have to guess the intent of the user when they're making interactions with the website. Another thing that we believe that's really instructive here is the reference to Walgreen. Now, one of the issues is that the Walgreen website wasn't one that you had to log in to access. It wasn't one where you had to get behind a patient portal. And the products that were being sold through the website weren't even prescription products. They were over the counter products that just related to a health condition of another person. I believe one of them was even a diabetic test kit, which doesn't say whether or not you have diabetes, it just tests your blood sugar. We would argue that that is even less connected to the health of a person than purchasing prescription glasses through a website that only sells prescription glasses. That's the issue that we have here is the website's very purpose is the filtering process that many of these other cases had as points of evidence along the way through the user journey on the website. One other thing we'd like to add is that for the sharing of the information, and I'd like to go back to this, is that the conversions API is a separate tool that Facebook offers. All the plaintiff's investigators could find is what's being sent from plaintiff's devices. We have no access to what's happening on the back end of things. And so to the extent that there are communications would be through discovery. Plaintiffs have no individual ability to go back and check for the information that's being collected and sent to third parties on that end of things. Now one other thing I'd like to include is there's a discussion of the details of the information sent through the URLs. Okay you have your time is up, so just finish your sentence. So all I wanted to add is that the information was alleged to be transmitted through multiple means. URLs was just one. Metadata was another group of information that also sent information. Thank you. Okay thank you. We appreciate both sides' arguments and we are now, this case is now under our determination and we're going to take a short break. We will be back at 10 30.